IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

TONEY L. WALTON,

    Defendant.

CRIMINAL CASE NO.
1:12-CR-00395-CAP-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This case is before the Court on Defendant Toney L. Walton's ("Defendant") Motion to Suppress Evidence, Motion to Suppress Statements, and Motion to Suppress In Court Identification. Docket Entries [23, 34, 35]. Defendant submitted a post-hearing brief in support of his Motion to Suppress Evidence and Motion to Suppress Statements. Docket Entry [45]. The Government filed a response in opposition. Docket Entry [48]. Defendant filed a reply. Docket Entry [52].

Having considered Defendant's motions and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence, Motion to Suppress Statements, and Motion to Suppress In Court Identification be **DENIED**. Docket Entries [23, 34, 35].

## DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS

On December 4, 2012, the grand jury entered a two-count indictment against

Defendant for knowingly possessing certain firearms as a convicted felon in violation of 18 U.S.C. §§ 2 and 922(g)(1) on two separate occasions: January 20, 2012 and August 15, 2012.  Docket Entry [1].  On January 26, 2014, Defendant filed a Post-Hearing Brief in support of his Motion to Suppress Evidence.  Docket Entry [45].  Therein, Defendant contends that evidence obtained during law enforcement officers' search of an apartment pursuant to an arrest warrant for the residents of the apartment should be suppressed.  In support, Defendant, who was staying as an overnight guest in the apartment, argues that law enforcement officers were not justified in entering the apartment because they did not have a reasonable basis for believing that the apartment was where the subjects of the arrest warrant lived and or that the subjects were within the apartment.  Additionally, Defendant contends that statements he made during the course of the entry and search of the apartment and during Officer Dixon's later investigation of a parked car on the side of the road should be suppressed because the law enforcement officers did not issue Defendant Miranda warnings prior to interrogating him.

I.    **FACTUAL BACKGROUND**

    A.    **The Search of Langston Avenue Apartment on January 20, 2012**

    On January 20, 2012, a seven-officer team traveled to 1545 Langston Avenue, Apartment 6, Atlanta, Georgia 30310 to execute arrest warrants for two individuals, Tijuan Leslie ("Leslie") and Kenyetta Hall ("Hall").  (Tr. of Nov. 12, 2013 Suppression Hrg. (Docket Entry 39), hereinafter "Tr.," 11-12, 82-84; Gov't's Exs. 1, 2).  Deputy

2

Andrew Yamayans, who worked in the Special Operations Division of the Fulton County Marshal's Office, and Lt. Mark Little, who was employed by the Fulton County Marshal's Office and served as a Task Force Officer for the Southeast Regional Fugitive Task Force of the United States Marshal's Service, acted as part of the team of arresting officers.  (Tr. 11-12, 82-84).

The warrants charged Leslie with aggravated stalking and Hall with stalking. (Gov't's Exs. 1, 2).  Deputy Yamayans testified that such arrest warrants are typically issued following certain procedures.  (Tr. 13).  First, a warrant application is completed with regard to a criminal defendant.  (Tr. 13).  A court date is then set, and the defendant is notified of that date.  (Tr. 13).  If a defendant fails to appear, the County Magistrate Court issues a warrant, which is forwarded to the Special Operations Division of the County Marshal's Service.  (Tr. 13).  The Special Operations Division then completes a packet of all pertinent information regarding the defendant and the charges against that defendant, including aliases, criminal history, photographs, and other descriptive information.  (Tr. 14).  The officers executing the warrant have access to the packet and review it if they need any additional information.  (Tr. 14).

In the present case, the team received the warrants as well as information about Leslie and Hall, including a general description of Leslie and Hall.  The information they received also indicated that Leslie and Hall resided at 1545 Langston Avenue Apartment.  (Tr. 14-15).  Upon receiving the warrants, Lt. Little took additional steps to verify Leslie and Hall's address.  Lt. Little contacted the prosecutor in the case to

3

ensure that all the information the team had regarding Leslie and Hall was current, performed a criminal history check on Leslie and Hall, obtained photographs of Leslie and Hall, and confirmed through a third-party database search – which compiles information about individuals from various sources – that the Langston Avenue address was current for Leslie.  (Tr. 27, 48, 82-86).  While the database compilation report's "current address" was normally accurate, it did list other addresses for Leslie and Hall. (Tr. 27, 82-86).

The uniformed, seven-member team of officers arrived at the Langston Avenue address at approximately 5:45 or 5:50 a.m., on the morning of January 20, 2013.  (Tr. 85, 87-88).  The early time was selected for two reasons.  (Tr. 17, 85-86, 91).  First, there was a good chance Leslie and Hall would be at home at such an early hour.  (Tr. 17, 85-86, 91).  Second, the pre-dawn darkness would provide increased safety to the team members, who were concerned about the aggravated nature of the felonies with which Leslie and Hall had been charged.  (Tr. 17, 85-86, 91).  The apartment building was a smaller-sized, standalone, two-story building without a driveway or garage, and apartment believed to be the suspect's was located on the second story of the building. (Tr. 17-18; 89; Gov't Ex. 3).

At the time the officers arrived, the lights in the apartment were off.  (Tr. 90).  As Deputy Yamayans approached the door, a light came on in the apartment, indicating that someone was inside and awake.  (Tr. 19, 89-90).  Deputy Yamayans knocked loudly on the door two or three times, and stated loudly, "Fulton County Marshals with a warrant."

4

(Tr. 20, 89).  After Deputy Yamayans' announcement, Deputy Yamayans, as well as and Lts. Davis and Little, heard movement – like footsteps – in the apartment.  (Tr. 20, 89).  Deputy Yamayans saw movement inside the apartment as something obscured the light through the peep hole in the door, indicating to him that someone was home and awake.  (Tr. 20, 89).  Deputy Yamayans knocked again, announcing himself as a Marshal.  (Tr. 20, 89).  Though the light in the peephole was again obscured as though someone was looking through it, no one answered the door for several minutes.  (Tr. 20, 89-91).  Deputy Yamayans knocked a third time, and still no one answered, despite continued indications of movement in the apartment.  (Tr. 20-21, 89-91).  Based upon their experience, the officers knew that when someone refuses to answer the door for law enforcement, it often indicates that a person within is seeking to avoid detection or attempting to hide something such as physical contraband.  (Tr. 93).  In such instances, upon entry, officers typically ask permission to look around for suspects identified in an arrest warrant being executed.  (Tr. 24).

Approximately three to six minutes after Deputy Yamayans first knocked, Defendant Walton finally answered the door.  (Tr. 23, 90).  Deputy Yamayans and Lt. Davis were the only officers at the door.  (Tr. 91).  Following standard protocol, Deputy Yamayans, Lt. Davis, and Lt. Little had their guns drawn, but held them in low ready position with the muzzles pointing down.  (Tr. 21).  When Defendant opened the door, Deputy Yamayans knew that Defendant was not Leslie or Hall because he did not match the descriptions the officers had obtained.  (Tr. 26).  Deputy Yamayans identified

5

himself.  (Tr. 23).  Deputy Yamayans spoke sternly and loudly to Defendant, but did not yell.  (Tr. 25).  Defendant's demeanor was calm and collected, and he was not panicked or excited.  (Tr. 25).  During the encounter, the Officers did not threaten Defendant, place him under arrest, pat him down, handcuff him, or point their weapons at him.  (Tr. 25, 57, 81, 94).  Additionally, the officers neither told Defendant that he could leave, nor told him that he could not leave.  (Tr. 25, 57, 81, 94).  Deputy Yamayans did not suggest that Defendant was subject to arrest.  (Tr. 23).

Deputy Yamayans advised Defendant that he had arrest warrants for Leslie and Hall.  (Tr. 23).  Deputy Yamayans asked if Leslie and Hall were home, and Defendant said they were not, but indicated that Leslie was his uncle.  (Tr. 23-26).  Defendant did not say that Leslie and Hall did not live there.  (Tr. 24, 26).  Deputy Yamayans also asked Defendant why he did not answer the door, and despite indications that someone was awake in the apartment, Defendant responded that he was sleeping.  (Tr. 24-25, 94, 96).  Deputy Yamayans decided that he needed to enter the apartment to determine whether Leslie and Hall were home because not only had Defendant confirmed that the apartment belonged to Leslie and Hall and that he was Leslie's relative, but also residents of an apartment would typically be at home at such an early hour.  (Tr. 24-25).  Additionally, based on Deputy Yamayans' experience, the lengthy amount of time Defendant had taken to answer the door and the appearance of movement in the apartment suggested that something or someone was being hidden.  (Tr. 24).  Accordingly, Deputy Yamayans told Defendant that the officers needed look around

inside the apartment to confirm that Leslie and Hall were not present. (Tr. 23). Deputy Yamayans motioned for Defendant to move back so the officers could enter the apartment, and Defendant stepped back, saying "Okay, well do what you got to do." (Tr. 23).

Deputy Yamayans, Lt. Davis, Lt. Little, and Deputy Willis entered the apartment to look for Leslie and Hall. (Tr. 28, 95-96). The search of the apartment only took a minute, as the apartment was small and the officers only checked places where a person might be hiding, avoiding checking drawers or opening envelopes. (Tr. 28-30, 95-96). While searching the small Apartment, Lt. Little spotted marijuana on the kitchen table. (Tr. 95). Lt. Little called out a code indicating the presence of drug contraband, and continued searching the apartment. (Tr. 29, 95-96). Lt. Little also found a military-issued ballistic vest in the closet in the living room. (Tr. 40, 101).

Deputy Yamayans stayed with Defendant, while the others looked for Leslie and Hall. (Tr. 28-30, 95-96). Deputy Yamayans asked Defendant where Leslie and Hall were. (Tr. 29). Deputy Yamayans testified that while Defendant initially could have left during the search if Defendant wanted to do so, once Defendant decided to stay in the apartment, he was under Deputy Yamayans' direction. (Tr. 57, 58). Deputy Yamayans informed Defendant that he could sit down if he wanted to, indicating on the couch with his hand. (Tr. 29-31). Deputy Yamayans also testified that due to concern for safety, he checked the area where Defendant would sit – in this instance, the apartment's couch. (Tr. 31-32). Upon lifting the couch cushion during the check, Deputy Yamayans

7

discovered a fully loaded pistol.  (Tr. 32-33).  Deputy Yamayans called out a code indicating the presence of a firearm, and told Defendant to remain standing as Deputy Yamayans cleared the gun.  (Tr. 33).

Lt. Little, having just finished his short search of the apartment, noticed a shotgun partially concealed by blankets on the same couch.  (Tr. 34, 58-59, 98).  Though the shotgun's stock and trigger were covered, the barrel of the shotgun was sticking out in plain sight.  (Tr. 58-59).  Lt. Little cleared the shotgun, and Defendant was told he could sit on a loveseat away from the couch, which was also cleared to confirm that no other weapons were concealed.  (Tr. 34, 58).

During this time, Defendant remained visibly calm, was not argumentative or combative, and did not make any complaints or request to leave.  (Tr. 36).  Defendant, unprompted, mentioned that the gun was not his, that he did not live there, and that he was just an overnight visitor.  (Tr. 36-37).  Defendant also stated that he was sleeping on the loveseat.  (Tr. 40, 102-03).  Lt. Little responded that he did not understand how Defendant was sleeping on the loveseat when the blanket and pillows were on the couch where the guns were found.  (Tr. 40, 102-03).  Lt. Little's comment was not pursued, and the conversation ended.  (Tr. 102-03).  At this time, Defendant had still not been arrested or placed in handcuffs.  (Tr. 103).

Following the discovery of the weapons, Lt. Davis obtained Defendant's identification and ran a check on it.  (Tr. 37, 42, 78).  Within a few minutes of securing the weapons, and while still in the apartment, Lt. Davis learned that Defendant had

AO 72A
(Rev.8/82)

multiple outstanding arrest warrants against him. (Tr. 37-38). Only upon discovering the outstanding arrest warrants was Defendant placed under arrest. (Tr. 42-43). At that time, Defendant was placed in handcuffs and escorted to one of the patrol cars, where he was secured in the rear of the vehicle. (Tr. 42-43). Defendant was not Mirandized at any time. (Tr. 123). Deputy Yamayans then took the guns and Defendant's identification to one of the officers outside for additional checks, and those checks revealed that the weapons had both been reported stolen. (Tr. 123). Less than six minutes had passed since the weapons had been secured. (Tr. 38-39). While Defendant was in the patrol car, Lt. Little asked Defendant if he was affiliated with any gangs. (Tr. 43, 108). Lt. Little wanted to ensure that Defendant would not be placed in the same area as members of opposing gangs. (Tr. 43, 108-09). Indeed, Lt. Little testified that he typically asks arrestees about such affiliations when they have tattoos like those that Lt. Little observed on the Defendant. (Tr. 43, 108-09). Defendant first responded no, but then said to "tell them I'm a Blood," after Lt. Little explained that he could tell the jail not to place Defendant in the general population area. (Tr. 43, 108-09). Defendant was then taken to jail, but was not interrogated by any other officers. (Tr. 147).

On July 18, 2012, an agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") interviewed the Langston Avenue Apartment landlord, who was also the owner and manager of the apartment building. (Interview Notes ¶ 2, Docket Entry [45-1]). The owner indicated that Leslie had rented the apartment since March 1, 2011, though

9

Leslie's brother often handled paying the rent. (Id. at ¶ 2). In January 2012,[1] during the week prior to Defendant's arrest, the owner spoke with Leslie, and Leslie told the owner that Defendant would be staying at the apartment while Leslie was in the hospital. (Id. at ¶ 3). The owner instructed Leslie to tell Defendant not to change the locks. (Id. at ¶¶ 3, 5). Leslie did not terminate his rental agreement, Defendant never signed an agreement with the owner, and Defendant never came to any verbal agreement with the owner to pay rent. (Id. at ¶¶ 3, 5).

The owner first met Defendant approximately ten days prior to his arrest. (Id. at ¶ 3, 5). The owner told Defendant directly not to change the locks. (Id.). At that time, Defendant told the owner that he did not have a key to the apartment. (Id. at ¶ 5). Despite this instruction regarding the locks, the owner discovered Defendant had in fact changed the locks. (Id. at ¶ 4). As a result, the owner instructed Defendant on January 19, 2012, the day before his arrest, to leave the apartment. (Id.).

### C.   Atlanta Police Encounter on August 15, 2012

Police Officer Gregory Dixon has worked for the Atlanta Police Department for four years. (Tr. 134-35). While working his normal beat in Atlanta, Officer Dixon encountered Defendant at approximately 12:30 a.m. on August 15, 2012. (Tr. 136-38). At the time, Defendant was seated with two other individuals in a parked car on the side of the road in front of a house known for drug activity. (Tr. 136-38). Officer Dixon was

---

[1] The interview notes appear to mistakenly refer to the relevant dates as occurring during January 2011.

aware that stolen vehicles had been found in an alley near the house.  (Tr. 139-40).  The car's engine was running, but its lights were off and there was no one in the driver's seat.  (Tr. 136-37).  Based upon his experience, Officer Dixon knew that individuals making illicit drug exchanges often leave their cars parked, but running, with their lights off, in order to expedite the transaction.  (Tr. 139-40).

Because of the suspicious nature of the location and other circumstances, Officer Dixon decided to investigate further.  (Tr. 140).  Officer Dixon parked his patrol car behind the car with his headlights and flashing lights on, but without activating his siren.  (Tr. 141-42, 146).  Officer Dixon radioed another officer about the situation, and ran the car's tag.  (Tr. 142-44).  Officer Dixon discovered that the car was a rental vehicle; Officer Dixon knew that rental vehicles were often used during the commission of drug crimes.  (Tr. 144-45).

Officer Dixon then approached the car with his flashlight.  (Tr. 141, 144).  Looking into the car with the flashlight, Officer Dixon saw Defendant in the front passenger seat, with an open beer next to him.  (Tr. 146).  Without drawing a weapon or threatening Defendant, the Officer calmly asked Defendant if he would step out of the car.  (Tr. 147-49).  Officer Dixon wanted to separate Defendant from the other two individuals in the car as he assessed the situation.  (Tr. 147-48).  Defendant agreed to step out of the car and started opening the car door.  (Tr. 148).  As Defendant opened the door, a firearm slid down the door, hit the floor of the car, and fell onto the street.  (Tr. 149-50).  Defendant tried to pretend nothing happened, and Officer Dixon did not

address the gun in an attempt to get Defendant away from the gun quickly. (Tr. 151-52).

For safety purposes, Officer Dixon took Defendant's arm and walked him away from the gun. (Tr. 152). Though Defendant was not under arrest, Officer Dixon placed him in handcuffs, again for safety purposes. (Tr. 153, 155). Afterwards, Officer Dixon retrieved the weapon from the ground, discovered it was loaded, cleared it, and placed it on the trunk of the car. (Tr. 153-55). Officer Dixon then patted Defendant down and asked if the gun belonged to him. (Tr. 155). Defendant denied being in possession of the weapon, saying it was simply on his side of the car. (Tr. 155). Around this time, the back-up officer arrived. (Tr. 156).

Officer Dixon placed Defendant in the back of his patrol car so that he could speak with the other passengers. (Tr. 157). After obtaining all three individuals' names and birth dates, Officer Dixon ran checks on the passengers and the weapon. (Tr. 157-58). Officer Dixon's check of Defendant did not initially return any information, so he asked Defendant directly if Defendant was a convicted felon or had permission to possess a firearm. (Tr. 158). Defendant indicated he was a convicted felon. (Tr. 158). The check on the gun revealed that it was stolen. (Tr. 160). As a result, Defendant was placed under arrest for possession of a stolen firearm. (Tr. 160). Defendant was taken to the police station, where Defendant indicated, without prompting, that he had recently been arrested for gun charges, and that it was bad for him to be arrested again. (Tr. 162).

12

## II.    LEGAL ANALYSIS

### A.    Motion to Suppress Evidence

Defendant seeks to suppress the evidence of the handguns, shotguns, marijuana, ballistic vest, and pills obtained during the officers' search of the Langston Avenue Apartment on January 20, 2012.  Docket Entries [23, 45].  Defendant contends that he has standing to contest the search of the residence because Leslie gave him permission to stay in the apartment and he was an overnight guest. (Id.).  Further, Defendant argues the officers' search of the home was illegal because they did not have sufficient evidence either that (1) the Langston Avenue Apartment was Leslie or Hall's current residence, or (2) that either Leslie or Hall was home at the time the officers arrived to execute the arrest warrants.  (Id.).

### 1.    Defendant has Abandoned his Challenge to Evidence Obtained on March 2, 2010 and August 15, 2012

As a preliminary matter, Defendant has abandoned his challenge to other evidence presented in his preliminary Motion to Suppress.  While Defendant's preliminary Motion to Suppress sought to suppress evidence relating his August 15, 2012 encounter with Atlanta Police, as well as another encounter with law enforcement on March 2, 2010, (Docket Entry [23]), Defendant's Post Hearing Brief (Docket Entry [45]) provides no argument in support of suppression of evidence obtained from those searches. Defendant has failed to perfect, delineate the arguments for, or otherwise expound upon the basis for the preliminary Motion to Suppress Evidence as it relates to the March 2,

13

2010 and August 15, 2012 encounters, either in his Post Hearing Brief or in his Reply Brief even after the Government noted Defendant's omission to do so in its Opposition Brief.   Accordingly, Defendant's motion in relation to those subjects has been abandoned.  See United States v. Cadet, No. 1:11-CR-00522-WBH, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), report and recommendation adopted, No. 1:11-CR-113-WBH-2, 2013 WL 504815 (N.D. Ga. Feb. 8, 2013) (citing United States v. Chappell, No. 1:10-CR-513-WSD-ECS, 2011 WL 5353016, at *5 (N.D. Ga. May 25, 2011) (deeming argument defendant raised in pre-hearing motion, but did not expound upon in post-hearing briefs, to be waived and abandoned); United States v. Shorr, No. 1:07-CR-182-1-TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (same). Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED AS ABANDONED** with regard to evidence obtained during the March 2, 2010 and August 15, 2012 encounters with police.

## 2. Defendant's Standing to Challenge the Search of the Langston Avenue Apartment[2]

---

[2] Although the Government conceded the issue of Defendant's standing to challenge the search of the apartment during the evidentiary hearing held on November 12, 2013, Defendant argued in his Post Hearing Brief that he has standing to challenge the search based upon the fact that he was an overnight guest and Dan Faust, the owner of the apartment, had given him permission to stay there.  (See Tr. 192-93; Def.'s Post Hrg. Br. 1-3, 25-27).  Defendant further requested that to the extent that the Court finds that evidence concerning Faust would affect the Court's decision as to whether Defendant had standing, the Court should allow Defendant and the Government the opportunity to examine Faust at a second suppression hearing. (Post Hrg. Br. 1-3).  The Government argued in its Response Brief that its concession of the issue of standing was hasty, that Defendant does not have standing to contest the search, and that it does not oppose reopening the suppression hearing.  (Gov't's

The Fourth Amendment of the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  To challenge a seizure as violating the Fourth Amendment, a defendant must have "standing," that is, a legitimate expectation of privacy in the premises being searched.  See United States v. Gonzalez, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991); see also United States v. Epps, 613 F.3d 1093, 1097 (11th Cir. 2010) ("'[O]nly individuals who have a legitimate expectation of privacy in the area invaded may invoke the protections of the Fourth Amendment.' ") (quoting United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009)).  As a result, governmental intrusion is barred in those places where an individual can establish a reasonable expectation of privacy.  See Katz v. United States, 389 U.S. 347, 353 (1967).

"Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."  Rakas v. Illinois, 439 U.S. 128, 134 (1978) (internal citations omitted). Consequently, a defendant who alleges a Fourth Amendment violation "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998); United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006).  The subjective prong is a factual inquiry, United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987);

---

Resp. Br. 27-31).  The Court need not reach the issue of standing, however, because the law enforcement officers' entry into the apartment and subsequent search was reasonable.

see also United States v. Jones, 184 F. App'x. 943, 947 (11th Cir. 2006), and "requires that a person exhibit an actual expectation of privacy," United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting Segura-Baltazar, 448 F.3d at 1286). The objective prong is a question of law, McKennon, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," King, 509 F.3d 1338, 1341 (11th Cir. 2007). A defendant bears the burden of showing a legitimate expectation of privacy in the area searched. United States v. Brazel, 102 F.3d 1120, 1147-48 (11th Cir. 1997); United States v. Bushay, 859 F. Supp. 2d 1335, 1361-63 (N.D. Ga. 2012) (defendant must demonstrate an expectation of privacy by a preponderance of the evidence).

Courts evaluate on a case-by-case basis, an individual's standing to challenge an intrusion by government officials into an area over which that person lacked primary control. Oliver v. United States, 466 U.S. 170, 191 n.13 (1984). Lack of ownership in the place searched is not dispositive of whether the Defendant has a reasonable expectation of privacy in the place searched. Chaves, 169 F.3d at 690. Even if a Defendant does not own the property to be searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place. Chaves, 169 F.3d at 690. To that end, the Supreme Court has concluded in Minnesota v. Olson, 495 U.S. 91 (1990) that an overnight guest in a third party's residence has a reasonable expectation of privacy when that residence is searched. Id at 96-100. There, the Supreme Court explained:

16

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.
>
> . . .
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings.

Id. at 99. On the other end of the spectrum, one who is merely legitimately on the premises is not entitled to protection. Carter, 525 U.S. at 91.

While no party disputes that Defendant was staying at the apartment as Leslie's overnight guest, the Government now argues that Defendant did not have a legitimate expectation of privacy in the apartment because Defendant became a trespasser after Mr. Faust, the owner of the apartment, directed Defendant to leave after Defendant changed the locks on the doors. The Court need not reach this issue, however, because the law enforcement officers' entry into the apartment and subsequent searches were reasonable.

### 3.   The Officers' Entry Into and Search of the Langston Avenue Apartment was Lawful

Defendant argues that the officers' entry into the Langston Avenue apartment to execute the arrest warrants for Leslie and Hall was unlawful because the officers did not perform sufficient due diligence to support their reasonable belief that Leslie and Hall resided there. In support, Defendant contends that the officers' reliance on a computer database to confirm Leslie and Hall's address was insufficient and points out that Lt. Little could not tell the Court how recent the Langston Avenue address was.

17

Additionally, Defendant argues that the fact that the warrant itself included the Langston Avenue address also could not have formed the basis for the officers' reasonable belief that Defendant resided there because none of the officers could testify who supplied the information regarding the address. Defendant further argues that there was no evidence that the officers conducted surveillance to confirm that Leslie and Hall had been seen there or that the officers had ruled out other locations. Thus, Defendant argues there was no reason to believe that the address that had been supplied was a current address.

Contrary to Defendant's argument, the Government has demonstrated that the officers had a reasonable belief, based upon the totality of the circumstances, that the subjects of an arrest warrant resided and were within the apartment at the time of the search. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971)). Nevertheless, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 560. It is well-settled within the Eleventh Circuit that the determination of whether it was reasonable for law enforcement to believe that the suspect is within a dwelling is evaluated based upon a two-prong inquiry: "first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." United States v.

<u>Magluta</u>, 44 F.3d 1530, 1533 (11th Cir. 1995).   The Government must make this showing by a preponderance of the evidence.   <u>Michigan v. Tyler</u>, 436 U.S. 499, 509 (1978).   To satisfy this burden, the Government need not show probable cause, but must show that "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality . . . warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." <u>Id.</u> at 1535.  This is a "practical interpretation" of <u>Payton</u>'s requirements, and because law enforcement must make an "on the spot determination . . . courts must be sensitive to common sense factors indicating a resident's presence." <u>Id.</u>  "Law enforcement agents are not required to establish with certainty that a suspect is residing at a residence" and "need not possess 'rock-solid indicators of residence in order to form a reasonable belief that a suspect resides at a given place.'" <u>United States v. Weeks</u>, 666 F. Supp. 2d 1354, 1367 (N.D. Ga. 2009) (quoting <u>United States v. Graham</u>, 553 F.3d 6, 13 (1st Cir. 2009)).

      a.    The Officers Had a Reasonable Belief that the Langston Avenue Apartment was Leslie's Residence

The facts and circumstances here show that the officers reasonably believed that the Langston Avenue apartment was Leslie and Hall's residence.  The circumstances present here are directly analogous to the facts presented in <u>Daker v. Steube</u>, 514 F. App'x. 885(11th Cir. 2013), in which the Eleventh Circuit found officers had a reasonable belief in the suspect's residency at the property searched.  <u>Id.</u> at 888-89.  In

19

that case, the officer had a warrant listing an address for the subject, checked the subject's driver's license address, and reviewed booking records for the subject. Id. at 889.  The Eleventh Circuit found that the officer's investigation was sufficient to show that the officer reasonably believed that the subject resided at the address indicated on the warrant.  Id.  Likewise, in this case, law enforcement officers had multiple sources of information confirming that Leslie resided at the Langston Avenue Apartment. Along with warrants listing the apartment as Defendant's current address, the officers received an information packet indicating that Leslie resided there.  (Tr. 14-15). Additionally, Lt. Little ran a criminal history check on Leslie and Hall and confirmed through a third-party database search that the Langston address was current for Leslie. (Tr. 82-86).  The database compilation report usually accurately reflected a party's "current address."  (Tr. 82-86).  Lt. Little also contacted the prosecutor in the case to ensure that all the information the team had regarding Leslie and Hall was current.  (Tr. at 27).

Furthermore, information the officers gained at the scene prior to entering the apartment confirmed that they were at the correct address.  When Deputy Yamayans asked Defendant if Leslie and Hall were home, Defendant said they were not; however, in doing so, Defendant did not say that Leslie and Hall did not live there (as one would expect if it were not Leslie's residence), and instead mentioned that Leslie was a family member.  (Tr. 23-24, 26).  In fact, when Deputy Yamayans said they needed to confirm that Leslie and Hall were not there, Defendant again did not deny that Leslie resided

20

there, instead telling the officers to "do what you got to do."

Defendant, citing to <u>United States v. Bervaldi</u>, 226 F.3d 1256 (11th Cir. 2000), suggests that "a computer database check for an address without more is [not] sufficient to satisfy" the requirement that the officers had a reasonable belief that the location to be searched is the suspect's dwelling.  (Post Hrg. Br. 35-36).  As noted, however, the officers obtained far more support that Leslie and Hall resided there than just the information from a computer database.  Moreover, contrary to Defendant's suggestion, <u>Bervarldi</u> did not reject the reliance upon information from database reports, government officials, and government records, but instead focused on the type of evidence that would be needed to overcome the presumption that such reports and records were in fact accurate.  <u>Bervaldi</u>, 226 F.3d at 1263 (discussing that while reports indicated that a first address was the suspect's residence, "strong evidence" that he lived at a second address could overcome the inference that the first address was suspect's "'permanent address' in some sense").  In <u>Bervaldi</u>, although there was additional surveillance evidence and records supporting the suspect's residency at the address searched, this evidence was contradicted by the main database compilation reports and official records. 226 F.3d at 1265.  In comparison, in the present case, there was ample record evidence that the suspects resided in the apartment, including the statements by Defendant, without any contradictory evidence.

While Defendant cites additional authority suggesting that more or different

21

evidence is also sufficient to establish the first prong,[3] Defendant fails to cite any authority suggesting that the information relied upon by the officers was not sufficient to establish their reasonable belief that Leslie and Hall resided at the Langston Avenue Apartment.   Cases rejecting address information as insufficient usually involve considerably less information than that present in this case.  See, e.g., United States v. Reynolds, 526 F. Supp. 2d 1330, 1341 (N.D. Ga. 2007) (holding that use of only the "bare address on [a] warrant" from a foreign jurisdiction, which itself was based on a minor traffic violation, without any other investigation, was insufficient).  "While the officers [in some cases] had more direct evidence regarding the arrestee's residence than the agents did here, these cases do not establish a requisite level of proof necessary to satisfy the Payton standard.  Rather, the Court must make a common sense assessment of the facts known."  United States v. Weeks, 666 F. Supp. 2d 1354, 1367 (N.D. Ga. 2009).  This Court is persuaded that given the totality of the circumstances, the Government carried its burden in demonstrating that the officers reasonably believed the Langston Avenue Apartment was Leslie's current residence.  Daker, 514 F. App'x. at 888-89.

> b.   The Officers Had a Reasonable Belief that Leslie was Within the Langston Avenue Apartment

This Court is also convinced that the officers reasonably believed that at least

---

[3] See, e.g., United States v. Weeks, 422 F. App'x. 447 (11th Cir. 2014); Sevostiyanaova v. Cobb Cnty., 484 F. App'x. 3335 (11th Cir. 2012); United States v. Zavala, 408 F. App'x. 319 (11th Cir. 2011).

Leslie was within the dwelling at the time they entered the apartment.  Again, in determining whether the officers' belief was reasonable, the Eleventh Circuit counsels that the Courts use a commonsense approach and officers are not required to be absolutely certain that a suspect is at home before entering a residence to execute a search warrant.  United States v. Magluta, 44 F.3d 1530, 1538 (11th Cir. 1995); Weeks, 666 F. Supp. 2d at 1368 (citing United States v. Terry, 702 F.2d 299, 319 (2d Cir. 1983) ("We have rejected the contention that the police must first conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence.").  Moreover, a court can take into account that a suspect may be aware that police are attempting to determine if he is home and officers "may presume that a person is at home at certain times of the day." Magluta, 44 F.3d at 1533; United States v. Beck, 729 F.2d 1329, 1331-32 (11th Cir. 1984) (concluding that belief that arrestee was present in the apartment was reasonable even though there were no signs of life emanating from the apartment, agents had not monitored the apartment to become aware of defendant's comings and goings, and no one had answered the door when agents knocked, because it was reasonable to believe that defendant would be home sleeping at 7:30 a.m., and to suspect that a fugitive may hide or flee instead of answering the door).

In this case, the officers' belief that the suspects were in the home was reasonable. In addition to the factors discussed above which supported the officers' reasonable belief that the residence was Leslie's, Deputy Yamayans also considered the fact that

23

an apartment owner would typically be home at 5:45 or 5:50 a.m. in the morning. (Tr. 17, 23, 25, 85-86, 88). Furthermore, suspicious activity from within the apartment supported the officers' conclusion that the suspects were inside the apartment. As the officers approached the door, a light came on in the apartment, indicating someone was inside and awake. (Tr. 19, 89-90). Despite Deputy Yamayans' repeated announcement and knocking, no one answered the door for nearly six minutes. (Tr. 20, 89-91). During this time, the officers heard and saw signs of movement within the apartment, and someone appeared to look through the peephole to determine who was outside. (Tr. 20, 89-91). Deputy Yamayans testified that this sort of suspicious activity normally indicates that an attempt is being made to hide something, such as a person seeking to avoid detection. (Tr. 93). When Defendant finally answered, he said only that Leslie and Hall were not present, and indicated that Leslie was his uncle. (Tr. 24, 26). When asked why Defendant did not answer the door, Defendant stated that he was sleeping, yet officers had observed signs of activity from within the apartment. (Tr. 24-25, 94). The fact that Defendant stated that Leslie and Hall were not home does not destroy the officers' reasonable belief that they were present in light of the aggravated nature of the crimes enumerated in the arrest warrant and the suspicious activity observed upon the officers' arrival. See Bervaldi, 226 F.3d at 1267. Because the suspects had been charged with felonies, because Defendant stated that he was Leslie's relative and could therefore have motive to protect him from arrest, and because it took such a long time for someone to open the door while movement was observed in the apartment (again,

24

suggesting something or someone had been hidden) it was reasonable for the officers to conclude that Leslie and Hall were in the apartment despite Defendant's representations to the contrary.  See, e.g., Daker, 514 F. App'x. at 888-89 (concluding that officers who took steps to confirm the suspect's residence, reasonably believed that the suspect was home, despite the fact that the person who answered the door stated the suspect was not home, where officers observed suspicious activity before the suspect's door was answered and the person answering the door was uncooperative); Magluta, 44 F.3d at 1535 n.11 (concluding that the "nature of the crime . . . may . . . support the inference that the defendant is concealing himself inside") (citing 2 Wayne R. LaFave, Search and Seizure, § 6.1(a) at 568 (1987)); Beck, 729 F.2d at1331-32. Thus, this Court concludes that the Government has produced sufficient evidence to support the officers' reasonable belief that the Langston Avenue Apartment was Leslie and Hall's dwelling, and that they were inside at the time of the search.  Thus, the officers lawfully entered the apartment that morning to search for the subjects.  Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**.[4] Docket Entry [23].

---

[4] Defendant has not contested that after entry, the discovery of the weapons and other evidence during the search of the apartment was improper.  (See Docket Entry [45]).  The rifle, marijuana, bulletproof vest, and pills were found in plain view, Weeks, 442 F. App'x. at 453 (citing United States v. Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991)), and the pistol was discovered during a lawful safety sweep. Michigan v. Long, 463 U.S. 1032, 1049-50 (1983); United States v. Standridge, 810 F.2d 1034, 1038 (11th Cir. 1987); (Tr. 32, 34, 37, 58, 64, 95, 101, 106-07).

AO 72A
(Rev.8/82)

**B.** **Motions to Suppress Statements**

Defendant further contends that statements he made to law enforcement officers during the course of his interaction with them at the Langston Avenue apartment should be suppressed because he did not voluntarily make them and the officers elicited such statements without giving him Miranda warnings.[5]   Docket Entries [34, 45].   The Government argues in response that Defendant's Motion should be denied because none of the statements Defendant made while at the apartment were elicited as part of a custodial interrogation.

This Court agrees with the Government that the duty to give Miranda warnings prior to any questioning was not triggered until after Defendant was placed under arrest and that all of the statements he made up until that time were voluntary.   The Fifth

---

[5]   In Defendant's Post-Hearing Brief, he also makes the bare assertion that statements he made to Officer Dixon after midnight on the evening of August 15, 2012, should also be suppressed because Officer Dixon did not read him Miranda warnings.   Defendant's argument in this regard, however, has been abandoned because he never developed the argument.   Defendant fails to present any reasoning or argument as to whether he was in custody at the time of his encounter with Officer Dixon or whether any statements he made were involuntary.   Accordingly, Defendant abandoned the argument and his Motion should be **DENIED** with respect to statements he made during the encounter.   Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009) (explaining that "an appellant's brief must include an argument containing appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," and that "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal").

26

Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations.  Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).  The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  The Court begins the inquiry into custody by determining whether, based upon the "totality of the circumstances, a reasonable [person] in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave."  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006); United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004).  "Although a reasonable person  . . . may feel constrained not to leave the scene of a police encounter at a particular moment . . . he will not necessarily be considered in 'custody.'"  United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010).  Instead, there must be a restraint on an individual's freedom of movement to the degree associated with a formal arrest.  Luna-Encinas, 603 F.3d at 881-82 (citing Newton, 369 F.3d at 672); United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006).  The test is

27

objective; neither the suspect's nor the officer's actual, subjective view is relevant. Peoples v. Campbell, 377 F.3d 1208, 1228-29 (11th Cir. 2004). Circumstances to be considered include whether and how the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and duration of the search. Luna-Encinas, 603 F.3d at 881 (internal quotation and citations omitted).

In this case, Defendant was not in custody until the point of his arrest. Upon approach and entry into the apartment, the officers did not threaten Defendant, pat him down, and did not put him in handcuffs. (Tr. 25, 57, 81, 94). While the officers did have their guns out, they were pointed in a downward direction and not at Defendant. (Tr. 21, 25, 57, 81, 94). At the time, Deputy Yamayans spoke sternly and loudly and did not yell at Defendant, and Defendant's demeanor was calm and collected. (Tr. 25). Moreover, Defendant was on his own familiar ground, that is his relative's apartment, and detained only for a very short time. Thus, even if is accepted that Defendant were briefly detained by Deputy Yamayans, he would not have reasonably understood that his freedom of action was curtailed to the degree associated with formal arrest. Luna-Ecinas, 603 F.3d at 882.

Defendant's circumstances are closely analogous to those of the defendant in United States v. Luna-Encinas, 603 F.3d 876 (11th Cir. 2010). There, the defendant was detained for a relatively brief period in a neutral, residential location, while officers searched for a drug suspect who was not the defendant, and the officers advised the

28

Defendant that he was not the suspect. Id. at 878-882; see also United States v. Brown, 441 F.3d 1330 (11th Cir. 2006) (explaining that circumstances are less likely to be custodial in a familiar or neutral setting)).  Like the officers entering the Langston Avenue Apartment, the officers in Luna-Encinas had their weapons drawn as they approached the defendant; however, those weapons were pointed downward and not at the defendant, and no one intimidated the defendant verbally or physically, even though they spoke in a "serious" tone. 603 F.3d at 881-82.  Like Defendant here, the defendant in Luna-Encinas was directed to sit down and was supervised by officers.  603 F.3d at 882.  Just as in Luna-Encinas, where the encounter with police lasted approximately five minutes, the encounter with the Defendant here lasted six minutes.  Id. (citing United States v. Medina-Villa, 567 F.3d 507, 519 (9th Cir. 2009) (noting that a shorter duration is less likely to be custodial)).  As a result, the circumstances of this case like those in Luna-Encinas, did not create the type of "coercive atmosphere that may require Miranda warnings . . . such that a reasonable person in [Defendant's] position would not have believed he was utterly at the mercy of the police."  As a result, Defendant was not in 'custody' when he made statements prior to his arrest, "the officers were under no obligation to advise Defendant of his Miranda rights, and no Fifth Amendment violation occurred."  Luna-Encinas, 603 F.3d at 882 (quoting United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir.2004)).

Furthermore, for similar reasons, this Court concludes that Defendant's statements were voluntarily made.  Courts assess the voluntariness of the defendant's statement by

evaluating whether "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Hart v. Attorney General of Florida, 323 F.3d 884, 892 (11th Cir. 2003). "To determine whether a confession is voluntary, the court must assess 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).   The court reviews numerous factors under this analysis, including the accused's intelligence, education, age, drug and alcohol use, psychological problems, and prior experience with the criminal justice system, as well as the length of the detention, the nature of the interrogation, the application of physical force or the threat thereof, and the use of a promise or inducement by police. Hubbard v. Haley, 317 F.3d 1245, 1252-53 (11th Cir. 2003) (citing Garcia, 890 F.2d at 360). This Court concludes that Defendant's statements in this case were voluntary.  Defendant was not questioned or detained for a lengthy period, he was not subject to unkind physical conditions, up until the point of his arrest, he was not handcuffed, subjected to the use of force, or otherwise subjected to police intimidation, and based upon his answers to police questions, he appeared to be lucid and did not appear to lack intelligence. Thus, based on the totality of the circumstances, Defendant's statements were voluntarily made.   Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED** as to statements Defendant made prior to being handcuffed and arrested. Docket Entry [34].

Although Defendant was clearly in custody by the time he was handcuffed and placed under arrest, the only questions directed to Defendant subsequent to his arrest were Lt. Little's questions as to whether Defendant was affiliated with any gangs. The Government argues that the questions posed regarding Defendant's gang affiliation were not for the purposes of interrogation or incrimination and should not be suppressed. (Response Brief at pp. 49-50, Docket Entry [48]). This Court agrees. The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. Even express questioning, when it is not likely to elicit an incriminating response, might not be considered interrogation as contemplated by the Court in Miranda. For instance, law enforcement questions pursuant to routine booking procedures, questions which are reasonably prompted by a concern for public safety, questions which were part of small talk conversation, and attempts to clarify a request to remain silent have not been considered interrogation within the meaning of Miranda. Pa. v. Muniz, 496 U.S. 582, 600-01 (1990) (questions regarding the suspect's name, address, height, weight, eye color, date of birth, and age were not considered interrogation); New York v. Quarles, 467 U.S. 649, 656 (1984) (public safety exception covered questions about the whereabouts of a gun); United States v. Jules, 244 F. App'x

964, 973 (11th Cir. 2007) (questions as to why defendant was laughing were not interrogation but rather casual conversation); United States v. Muhammad, 196 F. App'x 882, 886 (11th Cir. 2006) (questions designed to clarify a request to remain silent were not interrogation).

Under the routine booking exception, routine booking questions regarding a Defendant's age, height, weight, eye color, name, and current address are "reasonably related to the police's administrative concerns," and therefore exempt from Miranda's reach. Pa. v. Muniz, 496 U.S. 582, 601 (1990). However, questions that are reasonably likely to elicit an incriminating response may breach this booking exception. United States v. Corey, 861 F. Supp. 2d 1341, 1344 (S.D. Fla. 2012) (citing Muniz, 496 U.S. at 602 n.14), aff'd, 521 F. App'x. 759 (11th Cir. 2013). Though the Eleventh Circuit has not yet reached the issue, other courts have concluded that routine questions to obtain a suspect's gang affiliation in order to ensure prisoner safety falls within the routine booking question exception and does not constitute interrogation. See United States v. Washington, 462 F.3d 1124, 1133 (9th Cir. 2006); United States v. Edwards, 563 F. Supp. 2d 977, 999 (D. Minn. 2008), aff'd 618 F.3d 802 (8th Cir. 2011). The Court is convinced by Lt. Little's credible testimony that his questioning in this case was routine and for the purposes of ensuring prisoner safety. Accordingly, Defendant's statements regarding his gang affiliation fall under the booking exception. For this reason the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED** as to Defendant's statements relating to his gang affiliation provided in

32

response to Lt. Little's booking questions.  Docket Entry [34].

### C.    Motion to Suppress In Court Identification

In Defendant's Preliminary Motion to Suppress In Court Identification Based Upon Suggestive Out of Court Procedures, Defendant contends that the in court identification of Defendant expected from Dan Faust should be suppressed based on suggestive pretrial procedures.  Defendant contends that his Motion is preliminary because he needs to obtain a color copy of the photographic lineup employed in this case so that he can evaluate whether there were procedural issues requiring suppression.  At this Court's Suppression Hearing, the Government's counsel agreed to provide the requested color copies, yet Defendant still has not perfected his Motion.  Thus, this Court concludes that Defendant has abandoned the issue.  See Cadet, 2013 WL 504892 at *9; Shorr, 2008 WL 655994 at *1.  Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements and Preliminary Motion to Suppress In Court Identification be **DENIED**.  Docket Entry [35].

### CONCLUSION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence, Defendant's Motion to Suppress Statements, and Defendant's Motion to Suppress In Court Identification be **DENIED**.  Docket Entries [23, 34, 35].  There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial.  Therefore, this action is **CERTIFIED READY FOR TRIAL**.

33

**SO ORDERED, REPORTED AND RECOMMENDED** this 10th day of June, 2014.

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

34